# Hoffman *v.* Delaware, Lackawanna & Western Railroad Company, Appellant.

*Carriers—Common carriers—Railroads—Delivery—Misdirection on waybill—Negligence.*

1. In the absence of a contract providing otherwise, the obligation of a carrier of goods is to transport by the usual route adopted or held out to the public by him, and to deliver with reasonable diligence.

2. Where an employee of an initial carrier of goods omits a material portion of the direction in a transfer waybill delivered to the connecting carrier, and the goods are delayed by reason of such negligence, the

question whether the negligence of the initial carrier's agent is the proximate cause of the injury, is a question for the jury, and this is especially the case where it appears that the initial carrier was given special instructions as to the method of consigning by the consignee because of the fact that mistakes and delays had occurred in the delivery of freight to him because of the similarity of names of the town where he conducted his business and a city in an adjoining state. In such a case the mistake of a connecting carrier caused by the preceding negligence of the initial carrier will not be pronounced by the court as a matter of law the proximate cause of the injury.

3. Exemption in the contract of carriage from loss or damage beyond the line of the forwarder will not relieve the latter where such damage is brought about by his own negligent misdirection.

4. Where a railroad company does not fix the rate and route at the station where it receives freight, but arranges to have this done by the next connecting carrier, when it delivers the freight to it, the railroad company will be responsible for any fault of the agent of the connecting company when acting in the railroad company's behalf about the contract of shipment.

5. Where a carrier is notified of an undue delay within thirty days after the property is delivered, and the company takes prompt action to inquire into the facts and to protect itself against imposition, it will be deemed to have waived a provision in the bill of lading to the effect that the carrier shall not be liable if he is not promptly notified in writing after there has been due time for the delivery of the goods, and they have not been received.

6. In an action against a carrier for delay in delivering a machine, the defendant cannot be charged with special damages in the absence of any evidence to show that the injuries for which damage is claimed could not have been avoided by other means.

Argued Dec. 7, 1908. Appeal, No. 219, Oct. T., 1907, by defendant, from judgment of C. P. Northampton Co., April T., 1906, No. 14, on verdict for plaintiff in case of O. H. Hoffman v. Delaware, Lackawanna & Western Railroad Company. Before Rice, P. J., Porter, Henderson, Morrison, Orlady, Head and Beaver, JJ. Affirmed.

Assumpsit to recover damages for injuries caused by the delay of a machine. Before Scott, P. J.

The facts are stated in the opinion of the Superior Court.

The court charged in part as follows:

[Now, there is a provision in this contract that no road shall

be responsible, in effect, for acts committed upon some other railroad or by any of the agents of the other railroads and they have exempted themselves from liability for such acts by the contract here: and such contract is a valid contract. But you may take it from me as an instruction that that exemption of liability for the acts of such agency does not exempt the D., L. & W. R. R. Co. from the act of the agent or the representative of the Lehigh Valley R. R. Co. that undertakes to route and rate this property through to its point of destination, if you find from the evidence here that there was such a special arrangement made by the D., L. & W. Company with the Lehigh Valley R. R. Co. It is testified to, as I remember it, by Mr. McMillan, the witness called by the defendant, one of the principal representatives in the office of the D., L. & W. R. R. Co. It is suggested by the testimony of Mr. Mattes, the representative of the Lehigh Valley R. R. Co., only I don't recall that in his testimony he says there was any arrangement or special agreement to that effect, but that it was the practice; that is what they would do in such cases. As I remember Mr. McMillan's testimony, he says it was an arrangement that they had with the Lehigh Valley R. R. Co. So that if you find there was a special arrangement of that sort by which in the office of the Lehigh Valley R. R. Co. at Thirteenth street there was somebody constituted, or the road itself was constituted the special agent of this defendant company to rate and route through freight to its point of destination on their behalf because they had no such rates or routes on their local line and to other points where they didn't have, then the act of rating and routing this property as far as Baltimore or to Petersburg, Va., was the act of the D., L. & W. R. R. Co. through its own agent for that particular purpose, although the man who did it and the hand that executed the waybill was in the employ of the Lehigh Valley R. R. Co.: and there is no exemption for that condition provided in this waybill.] [15]

[If you find that the original neglect or breach of duty upon the part of the D., L. & W. R. R. Co., if you find it to have existed at all, was still operating and was the proximate cause of its going to Petersburg, Va., irrespective of the fact that

there intervened this inquiry to the Lehigh Valley R. R. Co. and the message from its agent to Baltimore, then you may consider the D., L. & W. responsible.] [16]

[Now, there are four elements of damages to which the plaintiff points your attention. One of them is the actual value of the machine, $241, which was the contract price. He did not receive that machine. He ordered a new engine to take its place, but he says to you and, of course, the Messinger Manufacturing Company, by delivery f. o. b. on board cars at Tatamy, had delivered the property, so far as they were concerned, to Mr. Hoffman at Petersburg, W. Va., and therefore, Mr. Hoffman would legally be required to pay for that machine unless in some way he was absolved. He asserts that it has not been paid for yet and the time of payment was postponed until the settlement of this suit. If you believe that, then Mr. Hoffman would be entitled to recover the contract price of that machine, $241.] [17]

[He points to the loss of manure, which he says amounted to 450 loads, the price of which was $2.00 a load, and he undertakes to satisfy you that there was a loss of 450 tons of manure from the fact that it wasn't possible to feed these cattle under any arrangements that he had made, of which the defendant had notice, by reason of the fact that he could not feed them within shelter. You will remember what has been said upon that score and that, in order to estimate the actual amount of manure that he may have lost, he took one cow for a certain period of time, ascertained its product and then multiplied that by the number of cows he had upon the place, and proves to you the market price of a load of manure. Now, you will say whether or not that is such a standard of computation that will enable you to say with a reasonable degree of certainty that there was a loss in consequence of that and of how much.] [18]

[The other item of loss you have also heard discussed, being for the difference in the feeding value of shredded fodder and corn; and with respect to that time, he must also be able to point you to some exact and definite fixed standard by which you can calculate the amount approximately of the loss. He asserts that he had consumed during this period of time, these

four months and a half, 1,500 shocks of corn. There were 900 there upon the place that he had. You will remember how it was described, 900 and 500 and about 100. The witness that he produced here said it was about 1,400, making it up of 900 and 400 that were on hand, or that he bought about 400 instead of 500, making a difference between the witnesses of 100, 1,500 shocks and 1,400 shocks. But he undertakes to give you the difference in the market value between so many shocks of fodder at such a value as $6.00 for the shredded fodder and $2.50 for the unshredded, making a difference of $3.50 in the market price of 1,500 stacks of fodder; 431 tons is what he claims it would be by the calculation, the arithmetical calculation that he has made, making by his proven calculation $1,508.60. Now, you have heard what took place in the discussion of his testimony, what has been said by both counsel respecting the fact that when he was called as a witness upon the first occasion here in this case that amount was made $700 or $750 instead of $1,500 and that in the affidavit the statement of claim which he originally made and filed in court a year or more ago the same amount was therein stated. It is suggested to you that the difference arose from a mistake in arithmetical calculation simply. These are considerations for you and you will be able to say, if you find that the plaintiff is entitled to recover, just how much he is entitled to recover under this evidence and under such instructions as I have given you, to which he would be entitled to have interest added from about May 1, 1902.] [19]

The jury returned a verdict as follows:

| | | |
|---|---:|---:|
| Horse-power | $ 241 | 00 |
| Expense of sending team to Keyser | 55 | 00 |
| Loss on fodder | 510 | 00 |
| Loss on manure | 285 | 00 |
| | $1,091 | 00 |
| Interest from April 15, 1902 | 357 | 85 |
| | $1,448 | 85 |

Judgment was entered on the verdict. Defendant appealed.

*Errors assigned* among others were (15–19) above instructions, quoting them.

*W. S. Kirkpatrick,* of *Kirkpatrick & Maxwell,* for appellant.— Where the facts are undisputed or the evidence not conflicting and no doubt is raised as to the credibility of the witnesses and a verdict on one side would have to be set aside as against the evidence, the court should direct a verdict: Lonzer v. Lehigh Valley R. R. Co., 196 Pa. 610; Rodgers v. Black, 15 Pa. Superior Ct. 498; Blotz v. Lehigh Valley R. R. Co., 212 Pa. 154; Cromley v. Penna. R. R. Co., 211 Pa. 429.

The decisive point, however, which was responsible for the deviation and delay sued for, was the independent intervening act of the Lehigh Valley R. R. Co. in changing by its telegram to Baltimore the destination given it and directing the shipment to the wrong point.

Under this contract of shipment, the D., L. & W. was but a forwarder and delivery to the connecting carrier ended its liability for any acts of succeeding carrier that might cause loss or injury to the shipment: Seibert v. Railway Company, 15 Pa. Superior Ct. 435; Keller v. R. R. Co., 196 Pa. 57; Clyde v. Hubbard, 88 Pa. 358; American Express Co. v. Nat. Bank, 69 Pa. 394; Pass. Railway Co. v. Trich, 117 Pa. 390; Card v. Columbia Township, 191 Pa. 254; Chartiers Twp. v. Phillips, 122 Pa. 601; Schaeffer v. Jackson Twp., 150 Pa. 145; Curtin v. Somerset, 140 Pa. 70; Bannon v. Penna. R. R. Co., 29 Pa. Superior Ct. 231.

Under the most favorable view of this testimony it was clearly, under the authorities, a question of fact for the jury and not for the court to determine absolutely whether there was a waiver, and whether the notice of the letter of September 4, 1902, which was nearly nine months after due time for the delivery of the shipment, was a proper compliance with the conditions of the contract: Pavitt v. R. R. Co., 153 Pa. 302; Eckert v. R. R. Co., 211 Pa. 267.

*Edward J. Fox,* with him *James W. Fox,* for appellee.—The inquiry must be, whether there was any intermediary cause,

disconnected from the primary fault and self-operating, which produced the injury: Bunting v. Hogsett, 139 Pa. 363; Haverly v. R. R. Co., 135 Pa. 50; Gudfelder v. R. R. Co., 207 Pa. 629; Thomas v. R. R. Co., 194 Pa. 511; Pennsylvania R. R. Co. v. Hope, 80 Pa, 373.

The initial carrier must so deliver the consignment to the connecting carrier that the latter will be under the same obligation to the shipper with respect to the goods as it would have been had it received them from the shipper: Palmer v. Ry. Co., 35 Am. & Eng. R. R. Cases, 629; Ill. Cent. R. R. Co. v. Southern Seating, etc., Co., 50 L. R. A. 729; North v. Merchants', etc., Trans. Co., 146 Mass. 315 (15 N. E. Repr. 779).

Notice of special circumstances requiring prompt delivery of the goods should be furnished at the time the goods are delivered for transportation: Rogan v. Wabash Railroad Co., 51 Mo. App. 665; 3 Ray's Imposed Duties, 392; Adams Express Co. v. Egbert, 36 Pa. 360; Martachowski v. Orawitz, 14 Pa. Superior Ct. 175.

No recovery can be had for loss of profits in contracts of sale made or contemplated by the shipper, unless the facts and circumstances of such sale are communicated to the carrier upon shipment: Pacific Express Co. v. Darnell, 62 Tex. 639; Brownell v. Chapman, 84 Iowa 504 (51 N. W. Repr. 249); Grindle v. Express Co., 67 Me. 317; Ill. Central R. R. Co. v. Cobb, 64 Ill. 128; Port Blakely Mill Co. v. Sharkey, 102 Fed. Repr. 259; Cent. Trust Co. v. R. R. Co., 69 Fed. Repr. 683.


OPINION BY HENDERSON, J., March 8, 1909:

In the absence of a contract providing otherwise, the obligation of a carrier of goods is to transport by the usual route adopted or held out to the public by him and to deliver with reasonable diligence. The defendant's undertaking was restricted by the terms of the contract to delivery to a connecting carrier on the route to its destination, as that place was beyond the line of the defendant's road. The subject of the transportation was consigned to the plaintiff at "Petersburg, W. Va., ℅ B. & O. Freight Agent, Keyser, W. Va." This place is a small town in the interior of the state, more than forty miles distant

from Keyser, which is the nearest accessible railroad station. To avoid confusion or misunderstanding, by direction of the plaintiff the property was consigned to the care of the freight agent at Keyser. It was not in contemplation of the parties that delivery of the freight should be made by the carrier at the ultimate destination. Its obligation would have been discharged by delivery at the railroad station indicated in the bill of lading. The agent of the defendant in making out the transfer waybill called "Pro. 573" omitted to write thereon the direction to transport to Keyser or to communicate any other instructions to the connecting company than were contained in the "Pro.," and this oversight the plaintiff contends was the proximate cause of the delay in the delivery of the machine. It appeared from the evidence of the defendant's own witnesses that the additional instruction as to the point of consignment contained in the original bill of lading would have aided in routing its conveyance and that with that information it would have been routed by Harrisburg, Shippensburg, Cherry Run and thence by the B. & O. road to Keyser. Instead of that the freight was rated and routed to Petersburg, Va. The question whether the negligence of the defendant's agent in not correctly transmitting the instructions as to the destination to the connecting carrier was the proximate cause of the delay in transportation was submitted to the jury and under the authorities we think this was proper. Whether the facts constitute a continuous succession of events so connected as to be a natural whole or whether the connection is so broken as to leave the parts independent and the final result cannot be said to be the natural and probable consequence of the negligence of the defendant is ordinarily a question for the jury. If the injury resulted from a cause not connected with the initial fault there is no liability, but the jury must determine the relation of the cause unless the fact clearly appears that there is no connection between the original fault and the injury: Haverly v. R. R. Co., 135 Pa. 50; Thomas v. R. R. Co., 194 Pa. 511; Gudfelder v. R. R. Co., 207 Pa. 629. It is only the duty of the court to determine the question as a matter of law when the inferences are plain and not open to doubt by reasonable men. Whether the

injury was a probable consequence of the negligent act of the defendant's agent and as such ought to have been foreseen in the light of the circumstances a jury only could determine, and this is the more manifest from the evidence that the consignee gave special instructions as to the method of consignment because of the fact that mistakes and delays occurred in the delivery of freight to him on account of the similarity of names of the town where he conducted his business and a city in an adjoining state. Conceding that the act of the agent of the Lehigh Valley company in response to the Ryan telegram specifically directed the delivery of the goods to Petersburg, Va., still it does not conclusively follow that that direction was an independent, intervening, proximate cause, for if the direction had been properly given by the defendant's agent to the Lehigh Valley company the freight would not have been in Baltimore and would not have been routed and rated to Petersburg, Va. It would have gone by a different and direct course toward its destination. At least, a jury would be justified in assuming that such would have been its course, and it might well be concluded from the evidence that the original negligence of the defendant was directly connected with the subsequent mistake of the agent of the Lehigh company in causing the loss, especially in view of the fact that it does not appear that there was any railroad station named Petersburg in West Virginia. The portion of the shipping directions omitted from the "Pro." was the only railroad destination given on the paper, and it was not an improbable consequence of the omission that the employees of the connecting road would be misled as to the terminus of the route. We are not warranted in declaring as a matter of law that the act of the agent of the Lehigh Railroad Company in directing the shipment to Petersburg, Va., was so independent of, and unrelated to, the negligence of the defendant's agent as to relieve the defendant from liability for the injury. Exemption in the contract of carriage from loss or damage beyond the line of the forwarder will not relieve the latter where such damage is brought about by negligent misdirection by the first carrier: North et al. v. Merchants', etc., Transportation Co., 146 Mass. 315; Johnson v. R. R. Co.,

33 N. Y. 610; Ill. Cent. R. R. Co. v. Southern Seating, etc.,
Co., 104 Tenn. 568.

The court left it to the jury to say whether there was a special
arrangement made between the defendant and the Lehigh
Valley Railroad Company, under which the latter company
would rate and route all property consigned to it over the
branch of the defendant's road from which this freight came,
with the instruction that if they should so find, then the act of
rating and routing the plaintiff's property was in legal effect the
act of the defendant, in which case the exemption from liability
clause in the bill of lading would not relieve the defendant.
This instruction was predicated of the evidence of Mr. Mc-
Millen and Mr. Mattes, from which it may be inferred that such
method of doing business existed. The company did not have
any arrangement for through rates or routes from the station
at which this freight was shipped to stations on the B. & O.
Railroad, and it became necessary to have the freight rated and
routed under their arrangement with the Lehigh Valley com-
pany at their junction at Easton. It is not to be supposed that
when the defendant accepted the consignor's freight it was the
understanding that it was to be delivered at Thirteenth street
in Easton. Its obligation went beyond that. The freight was
accepted for delivery at a distant station and the carrier's duty
was not performed when it was brought to Easton. The rail-
road company was required to deliver the consignment to the
connecting carrier, and if, as the evidence tends to show, instead
of fixing the rate and route at the station where it received the
freight it arranged to have that done by the Lehigh Valley
Railroad Company it would be responsible for any fault of the
agent of the latter company when acting in the defendant's be-
half about the contract of shipment.

Objection is made to the instruction of the court with refer-
ence to that provision of the bill of lading which provides that
claims for loss or damage must be made in writing to the agent
at the point of delivery promptly after the arrival of the prop-
erty and if delayed for more than thirty days after the delivery
of the property or after due time for the delivery thereof the
carrier shall not be liable in any event. That a claim in writing

was made within thirty days after the property was delivered at Keyser is clearly established.    There is also evidence that a letter was read to the station agent of the defendant at the place of shipment containing notice of the failure to deliver promptly.    After notice, the defendant undertook to locate the shipment and to deliver with dispatch.    The plaintiff was also notified by the agent at Keyser that there would be plenty of time after the arrival of the machine to serve notice; that there was no evidence before him that the freight had come on to the line of that road.    This evidence if credited shows that the defendant had prompt notice of the nondelivery of the freight as had the agent at the point of destination, and the conduct of the defendant with reference to the delivery of the property after notice of nondelivery brings the case within the doctrine of Eckert v. R. R. Co., 211 Pa. 267.    The object of the provision in the contract for notice is to enable the carrier to take the necessary steps to bring about the delivery of the property or to inquire into the facts and protect against imposition.    All this was accomplished in the case now before us.    The company had the full benefit of the provision for notice, and its conduct subsequent to notice raises a basis for the conclusion that further notice in writing was waived.

In addition to the cost of the machinery and the expenses incident to its shipment, which would be the amount of damage ordinarily, the plaintiff claimed special damages for the loss of the use of the machine and recovered $500 for loss on fodder and $285 for loss on manure.    The case was apparently submitted to the jury on the theory that the machine was indispensable to the shredding of the fodder and the economical feeding of the cattle, but it is not to be overlooked that it was not a machine for shredding or cutting fodder; it was a power apparatus simply which could be attached to machinery adapted to shredding fodder or so far as appears to any other agricultural implement.    It was not a machine of peculiar construction and specially adapted to the particular purpose, and it is not shown that another power might not have been obtained to answer the same purpose.    Indeed, it did appear at the trial that the defendant had procured a gasoline engine

from the same manufacturer in February following the shipment of the horse power, and he had notice in December that his machine had been miscarried and was at Petersburg, Va. Moreover, the evidence as to the necessity for feeding the fodder at the time and in the way in which it was done does not bring the case within the class entitling the plaintiff to special damages. According to the plaintiff's statement, when he bought his farm it was arranged to feed whole fodder in the cattle pens. He had this construction torn out and boxes put in for feeding shredded fodder. There were stalls all through the place. These he caused to be torn out and the sheds divided into sections of ten so that ten cattle could be fed in one section. There was also a large barnyard for them to run in and straw racks there for feeding straw. According to his theory it was not possible to feed them whole fodder in that arrangement, but we are not informed what difficulty there would have been in adopting a plan under which the whole fodder could have been fed, nor what the cost of such arrangement would have been, nor whether it was necessary to feed the fodder before he got the power to operate his shredder. The claim for the loss on manure grows out of the alleged inability to feed the cattle at the barn. The winter was cold, and in order to protect the cattle they were fed in a hollow in a sheltered place and in the woods, with a consequent loss of manure. If loss is to be charged against the defendant in accordance with the convenience of the plaintiff his calculations may be well supported, but it must first be shown that there was no other reasonable or practicable way in which his feeding enterprise could be economically carried on. He was not at liberty to indulge in what he alleges to have been a wasteful method of taking care of his stock and charge his loss to the defendant. It should be made clearly to appear that it was necessary to feed the cattle in the woods rather than in the barn or barnyard, and that there was no available means of securing power to operate the shredder, before the jury could enter into a consideration of the loss set up in this branch of the plaintiff's case. In these days of multiplied and easily obtained implements for the production of power the inability of the plaintiff to pro-

vide means for cutting his fodder or to feed the same to his cattle in his barn should be made reasonably to appear. Nor do we think that the information communicated by the manufacturing company to the agent of the defendant at the time the shipment was made was of such facts as would put the defendant on notice of such results of a breach of the contract as are involved in this branch of the plaintiff's claim. The measure of damages in case of a loss of freight is ordinarily the value of the thing lost or the contract liability. The value here was shown to be $241. The jury also found that the plaintiff was subjected to $55.00, expense of team. As the verdict returned by the jury discloses the items composing the aggregate we know what part of it was made up of these items. The verdict should, therefore, be modified and judgment entered for the amount recoverable on the case as presented, to wit: the price of the horse power and the expense incurred in sending a team to the station to transport it to the plaintiff's farm. These items amount to $296, to which should be added interest for five years, five months and eighteen days, to the date of the verdict, making the amount of the judgment $393.09 at that time.

The judgment as thus modified is affirmed.